May it please the court. My name is Randall Levine for Appellant TDY. I'd like to just reserve three minutes for rebuttal right now if that's all right. Yeah, you'll have to keep track of your time if we're asking. Keep track of your own time, but yes, of course you may. Very good. This is the second time this CERCLA contribution case has been before this court on appeal. In TDY 1, this court held the district court abused its discretion by allocating 0% of the cost to the government. Three errors in particular drove that reversal. First, the district court failed to consider that TDY wasn't negligent and government specs required the contaminants at issue. Second, it disregarded the contractual course of dealing. And third, it misapplied binding circuit precedents. The district court repeated all three errors on remand and abused its discretion again by allocating the government just 0.6% instead of 0%. Counsel, I'd like to ask you what what effect the concurrence has because the concurrent judge completely concurred. It wasn't a special concurrence. It was part of the main deal saying go back and look at these factors again and yet very clearly said that something very close to zero would be permissible on this record. Now, isn't that the sort of hint that a district judge is entitled to take into account in doing the analysis? Judge Watford's concurrence is best read as a concurrence in the judgment and and in fact But that's not what it says. It's not what it says, but it's a straight concurrence, but it's not what it says, but it is what what Judge Watford was doing. Judge Watford was explaining the way he might rule given the opportunity, but the points that he was making are several of them are just simply inconsistent and irreconcilable with the majority opinion. For example, the point that you just mentioned where Judge Watford said that he thought something you know close to zero percent for the government might be able to be upheld. The central holding of the majority opinion is that the facts of this case do not support an extreme departure from the allocation in the Shell case and the Cadillac Fairview case. On the other hand, the opinion towards the end says well yet those cases are different and sets out some of the reasons why they are distinguishable. So it seems to me a mixed message to the district court, very mixed message to the district court about what what it had to do besides just re-look at the whole thing and come up with a different result and and the judge did that, looked at it again and came up with a result. Well, we disagree that the district judge actually looked at it again. Nothing about the district court's opinion changed in response to TDY 1, at least nothing of substance. Of course it did. It went from zero to a number higher than zero and that's definitely a change. A 0.6 percent increase is symbolic. It was lip service to the... It really misrepresents what went on. Judge Fletcher, it's hard to hear you. Could you repeat? Yes. With respect to certain chemicals and with respect to certain periods, there are two different chemicals, the government was assessed 10% and 5%. You're taking the overall award and saying 0.6, but it's actually 10% and 5% during relevant periods. Well, even that is actually a misleading way of looking at it because it's not a straight 10% and 5% of two chemicals. First of all, there's there's three chemicals at issue and for one of those chemicals, PCBs, the court arbitrarily decided to assign 0% to the government without any explanation or rationale whatsoever. Well, that's not quite true either because the difference is that that chemical was not required by the government contracts and so it was voluntary on the part of your client that you may not agree with it, but I don't see how that's arbitrary or absent an explanation. Well, that's not consistent with the record that the district court found. The reason or among the reasons that the government was found to be a PRP is because it owned equipment at the site and that equipment was found to have leaked PCBs. So to the government liable for 0% of the PCB contamination, even though it was the government's own equipment that leaked the PCBs, is arbitrary and the court didn't revisit that decision even though this court identified many factors that the court was supposed to have considered that all point to a high, high allocation of responsibility for the government. For example, right, the district court didn't consider at all that this court found that the fact that the government owned equipment at the site, that 90 to 100% of the site's work came from wartime contracts, that PCBs leaked from government equipment, and the fact that TDY had used industry standard processes and had complied with all of the environment rules and that the government had reviewed and approved all of the processes that resulted in the contamination. The district court just disregarded all of those factors on remand and instead... I take it that you made these... And wasn't it just supposed to think again? Well, no. In TDY 1, when this court reversed and held that the court's prior analysis was an abuse of discretion, this court defined the factors that the court was supposed to take into consideration on remand. It was supposed to take into consideration those factors it listed. The court was supposed to take into consideration the contractual history between the parties in which the government had voluntarily agreed to pay 90 to 100% of the cleanup costs that TDY had incurred. And so, so, doesn't that cut against your position? In other words, because the government already paid a whole lot of money under those arrangements, it's somewhat misleading to say that they're paying only 5% or 10% or 0.6%. They really... If you look at the total problem, paid a lot more than that. So why doesn't that cut against your position instead of in favor of it when the court looks at it? I don't think that's right. I think what the contractual course of dealing demonstrates is that when the parties were free to allocate this liability amongst themselves, the government and TDY understood that it was fair and reasonable for the government to foot the bill for these costs for all of the reasons that this court recognized in TDY. And in fact, that's perfectly consistent with, for example, the decision in the Cadillac case, and in the Shell case too, where the district court and this court in affirming those cases found that if the parties had an opportunity to allocate this cost contractually, they understood that the government benefited so much from this production that the government would have paid for this cleanup. Well, we don't have to speculate about that here. We know that's what happened, because the parties did have an opportunity to allocate the cost amongst themselves, and they allocated it to the government in an amount that was consistent with the amount of work that was being performed for the government at the site, which was 90 to 100% of the work at the site. This court already decided in TDY1 that that was a relevant factor and that it was important to the analysis. The district court didn't have discretion to just ignore it again and reaffirm its prior decision that said that that contractual history doesn't matter and doesn't weigh in favor of an allocation to the government. That was already decided. So it was the court's job on remand to decide how much that weighs in the analysis and to actually consider that that provides a baseline. It sets an expectation among the parties that the government is going to at least participate in, to a great extent, the payment for the cleanup at the site, as it always had done. This is another reason why the district court's decision on remand went astray. It's because this court specifically held that there were important similarities between this case and the Cadillac Fairview case and the Shell case. Those similarities needed to be considered, and they weighed in favor of a substantial allocation to the government. The court said that the facts of this case simply don't support an extreme deviation from the allocation in Shell Oil and Cadillac Fairview. On remand, the district court repeated exactly the same error. Can I interject for a moment? Yes, Your Honor. I'm not sure that the current decision is an extreme deviation from the Shell Oil case. I wrote Shell. I understand that case very well. Judge Fletcher, it's hard to hear you. Can you speak louder? Particularly in Shell, but in both of those cases, the rationale for imposing the liability on the government was that the government had directed the company to do that. Your company was not directed to drip the material onto the concrete. It was directed to do certain things. Some of the things were inescapable. For example, the fact that it would go into the aerosol and come down on the equipment. But I don't see the decision of the district court here as inconsistent with Shell. In fact, I think it's quite consistent. You might disagree, but it says the only things that were an inescapable consequence of the government's action, it's going to say the government pays for that. The things that were TDY's actions, uncompelled by the government, TDY's responsible for. I see that entirely consistent with Shell. Well, I think the important thing to recall is that the district court didn't find that any aspect of TDY's operations or practices violated industry standards. All of those practices, including the ones that resulted in the contamination, were observed by the government and approved by the government in specific process documents. The bottom line is that just like in Shell and just like in Cadillac, the government had a need. It needed to produce planes for the war effort. And the contamination resulted from the government-approved process for manufacturing planes. The contamination would have occurred no matter who operated the site because the process would have been the same no matter what. It was the government's contracts and specifications that were the but-for cause of the contamination. And that's why the parties agreed that the government should pay the majority of the cleanup costs throughout the entire course of dealings between the parties. In Shell, the government was not more directly involved than it was here in the sense that here the government could have controlled any process that it liked. It had the capacity to do it. It was observing those processes. It was aware of what was happening. But it didn't control them. And there was no reason for it to change anything that TDY was doing because at the time this contamination occurred, no one, not the government and not TDY, understood that these chemicals were harmful or that there was any need to exercise any special care with them. But the district court expressly found that as time progressed and as it came to be understood that these chemicals were hazardous and as there came to be environmental regulations, TDY promptly and at all times complied with those environmental regulations and took the steps necessary to minimize the releases. That's a factor that in TDY 1, this court expressly found undercut the district court's decision to allocate 0% to the government. But again, on remand, that did not cause the district court to change its allocation even one dollar. The district court simply disregarded that fact even though it was firmly rooted in the district court's own findings of fact. So in that sense, I don't think this case is meaningfully distinguishable from Shell or from Cadillac Fairview. The government could have controlled and done whatever it needed to do to stop the releases if there had been a reason to do so. Excuse me just a minute. There's a difference between could have controlled, which is this case, and Shell, which was did control. With respect to your Honor's expertise, I know you wrote the opinion in Shell, but one of the findings of the district court was that the government in the Shell case was aware that waste was being produced and was aware that waste needed to be disposed of but was not aware or involved in the specific activities that the contractor took to dispose of the waste. That's not all that different from what actually occurred here. The government was aware that these processes were going to result in some drips and spills or other operational releases and it just wasn't important to make sure that those were stopped until it became obvious that those chemicals were hazardous and there needed to be greater controls. So I don't think that there's actually that much of a meaningful distinction, but even if there is one, and this court in TDY1 did find that there were factual distinctions between this case in Shell and this case in Cadillac and that those factual distinctions would warrant some adjustment. The court didn't say that the same 100% allocation to the government was necessarily compelled by those cases, but it did say that the facts weren't so different that it could encompass a 100% change. It said that actually no sharp deviation could be upheld. This case might be different from Shell, but it's not 100% different from Shell. It's not even 99.4% different from Shell. The basic facts of the government contracting with a contractor for important war materials that resulted in contamination and where no party is at fault, no party is negligent, no party has an informational advantage over the other in cases like that, similar to Cadillac and similar to Shell. This court has previously affirmed a 100% allocation to the government. It can't be the case. I have one other question for you. Because we review for abuse of discretion, on a similar record, one judge might make one allocation, a second judge half that allocation, a third judge a quarter of that allocation. It's possible that none of them is an abuse of discretion. That's kind of the point of discretion. Even under the please go rethink it mandate, I don't know why you would say that it had to be the same or close to the same just sort of as a matter of law. In certain cases, the abuse of discretion standard is defined by abuse of discretion and choosing the correct factors to consider and then applying those factors. If the court chooses the wrong factors, that's abuse of discretion. But on remand, we have to assume that the judge followed the directions and therefore considered the correct factors. I don't think there's any reason to assume that. In fact, the district court's opinion on remand refutes the whole idea. On remand, the district court did not consider the factors that this court said were important in TDY 1. Well, did we say they had to be written down or did we say they had to be considered? Not even just that they needed to be considered. It said that they were relevant factors to the analysis. So they needed to be considered and they weighed in favor of allocation of the cost to the government. They could not be disregarded and they could not be found to weigh against allocation to the government. That's what TDY 1 held. And it held that was true both for the contractual course of dealing between the parties and it held that the court needed to consider the similarities between this case and Schell and Cadillac and the importance of precedent. And it also held that there were other factors that needed to be considered that the court abused its discretion by failing to properly consider. Discretion, even in circling cases, has limits and those limits are important. And here, they're even further limited by the fact that the district court below was not writing on a clean slate. It was not a free shot at another abuse of discretion standard to decide however the district court thought appropriate. The district court needed to calibrate its decision according to what this court said in TDY 1 which constrains its decision on remand. And so there's two elements. You're down to your three minutes if you want to reserve it. I will do so. Thank you very much. We'll hear from the United States. Go right ahead. Thank you. May it please the court. My name is Rachel Heron on behalf of the United States. Can everyone hear me all right? Yes. Thank you. Your Honors, it's undisputed that for 60 years TDY was the owner and the sole operator of the Harbor Drive site and it had unfettered control over the maintenance decisions that caused the contamination that's an issue in this case. The United States was its customer and to be sure it was a relatively involved customer but that does not make it a liable party under CERCLA. Instead, the reason that it's liable under CERCLA is that it happened to own some equipment at the site during some years of operation. Those are the undisputed facts. On those facts the district court originally held that the United States bore no equitable responsibility for TDY's costs at the site. This court reversed that decision. It did so because it identified two errors in the district court's analysis but this court did not instruct the district court as to what size share the United States should bear on remand after the district court had the opportunity and the obligation to address those two errors that it identified. Only explicit guidance that the district court got on that question of what size share was appropriate was the concurrence that was written by Judge Watford which explicitly said that something close to the court's original allocation would be appropriate and no other member of the panel wrote to disagree. Judge Watford, we can't hear you. Now I'm unmuted. Let me push back just a little bit on that. Often you write a concurrence because while you don't disagree with what has been said in the majority opinion for the court you can't get the others to say what you want to say. Yes, it's guidance but there's an implicit understanding that this concurrence is written because the two other judges didn't want to say it themselves. Your Honor, without speculating as to what the judges were thinking, I think the importance of the concurrence is that it is not inconsistent with the language of the majority opinion. I would also say that in this circumstance where the concurrence is the only piece of document that the court gave to the district court in which there's an explicit discussion of the question of what size share is appropriate, that in that case if one of the other judges disagreed that might be a particularly appropriate situation where you would want to get that disagreement out there so the district court understood its obligation. Either way, what Judge Watford said was not inconsistent with what the majority said because the majority opinion simply didn't answer the question of what size share was appropriate. I would also say that the fact that the majority didn't answer that question is entirely consistent with the surplus standard of review and with what the role of the I think in some ways it's an appropriate analogy to think about what happens when this court reviews a decision of an agency under the APA where the question for the court is was there when the question is application of the factors was there a clear error that the district court committed? If it finds that there was, the court's job is to say so and to remand not to itself then say okay, well once these errors are corrected what is the appropriate share that the government or whatever parties are involved should receive. Council, I do have one question for you. The one area where I have some concern has to do with the government contract question because the court didn't really say anything new or really at all about that. So, what do we make of that as to whether the court did reconsider that issue as directed? Your Honor, so I would push back on the idea that the district court didn't say anything new and I would make two points. I think the first and most important difference between the decision on remand with regard to contractual history and the original decision on that issue is that the remand decision no longer relies on the analogy regarding a customer paying a recycling fee that was the thing that this court in TDY 1 explicitly said was a problem with the analysis that it had applied the first time around. When you go to that original allocation decision on the issue of contractual history, the entirety of the analysis is one paragraph describing the facts and then one and it was, again, that analogy that this court explicitly said was not apt and was not a basis for saying that the contractual history here did not warrant any share to the United States. So, I think the most important change is that that analogy is not part of the court's analysis in the remand opinion. What the court does in the remand opinion instead, I think it is different in that it in the remand opinion unlike in the original opinion goes through and specifically describes what the contractual history in the Cadillac Fairview case was. That is the case that was the basis for this argument that contractual history can potentially tell us something relevant about how the parties are taking responsibility for their costs. And it explained what happened in Cadillac Fairview, specifically that in that case the government agreed explicitly to hold harmless the contractor and then it offered a contrast here and it went through and it recounted that there were no sort of explicit suggestion or statement from the government that it was accepting responsibility by the payment of past overhead costs and instead what it included was that the payment of past overhead does not constitute an acceptance of responsibility and that I think is the government put before the district court ample briefing on that topic, sort of getting into the details of the federal contracting regulations and why it is that overhead payments don't say anything about the parties' causal responsibility and don't say anything about what the parties would intend to happen at a time where the contractor was no longer actively performing contracts for the government. The district court didn't recite that in its opinion but that information was certainly before the court and the court its conclusion is consistent with all of that briefing and PDY has not offered any substantive rebuttal to that explanation as to why overhead payments are simply different than a hold harmless agreement in terms of what it tells us about the parties' intent which is the relevant question for contracting history when we're in a CERF equitable allocation. Just a couple other points that I would hit your honor in response to some of the points that were made in the opening argument specifically with regard to this court's past decisions in Shell and in Cadillac I would say that in general I think PDY's suggestion that the facts of this case need to be 100% different than Shell and Cadillac to justify that there has to be some mathematical correlation between what the facts are and how much the deviation is simply not the way CERF allocation works because as was stated by your honor the allocation that is ultimately chosen by a district court and affirmed by this court is not a statement that that allocation is legally correct but that it's permissible and in any event I would say that the facts of Shell and Cadillac are meaningfully different or at the very minimum that the district court is clearly there especially given that this court in PDY 1 acknowledged that there were important distinctions between those cases and that those cases specifically went toward the level of control that the parties had over the activities that led to the contamination and that issue of control and specifically how it relates to causal responsibility was the primary equitable consideration that the district court relied on as other courts have also done. Two other points that I would hit on very quickly. I've heard that the counsel for TDY say that the district court did not take into account at all the fact that TDY was not negligent during years of operation and I think that's not an accurate assessment of the district court's opinion. Certainly the original allocation is standard that TDY's conduct did not fall out of line with the standard that's there given the time and the allocations were ultimately chosen. The remand specifically with regard to our Native Department does account for the fact that some of the things that TDY was doing were standard of the time for the region. So could you speak a little louder? I'm having difficulty there's some machinery going outside my window. Apologies Your Honor. I will speak with greater volume. Just for the reasons stated in the government's brief, the chromium and fluorinated solvent allocations that the district court ultimately settled on do account for the standards of the time. I think it's easiest to see with regard to the fluorinated solvents where the court acknowledged that at the time that TDY was dumping fluorinated solvents down the sewer, it had a permit to do so and it was legal and therefore it gave the United States a share of the costs associated with that dumping. As for the assertion that anyone, that no matter who ran the company or the plant, this would have been happening at the time there's simply no factual finding for that effect. It's true that TDY's actions, the district court found more negligent but they nevertheless as the court said at multiple points were not the only option and were not particularly prompt house cleaning. The idea that this is inevitable in fact is directly in the teeth of what the district court actually found which was that the government's requirements did not make contamination inevitable but for those two reasons that it did allocate the United States a share for. The only other point that I would question is the issue of the 0.6% and I think that in the government's view the 0.6% that TDY cites, you know while we're not challenging TDY's arithmetic, I think it's not the appropriate way to look at what the district court did here. The court in its discretion chose not to allocate costs on a site-wide basis but instead did so on a source-by-source basis because it found the United States had significantly different causal responsibility for different sources of contamination and it gave the United States a 5% share and a 10% share of the cost that it felt the United States did have causal responsibility for and to sort of then look at an inflated denominator that takes into account not only all disputed costs but all costs after for releases after 1979 for which the United States is not even liable and the cost of PCBs, which the district court originally found the United States was not equitably responsible for and which this court's decision in TDY did not require the district court to disturb, dilutes the force of what the district court actually did. In conclusion, unless your owners have other questions, I would say that at the end of the day the question for this court is not whether the district court's allocation was correct or whether TDY would have chosen it or even whether this panel would have chosen it if they were in the district court's position. It's simply whether the district court abused its discretion in selecting factors or committed an error. As it did not, we ask this court to leave the room. Thank you, counsel, and I believe there Mr. Levine has some rebuttal time remaining. Thank you, Your Honor. Just a few points to make in rebuttal. First, with respect to Judge Watford's concurrence, I just think it's important to highlight that in his concurrence he expressly states that he's stating that he agrees with his colleagues that the record does not support allocating 100% of the cleanup cost to TDY, but then after that he's expressing his own view in the first person. He's not purporting to interpret what the majority opinion says and he's not purporting to instruct how the majority's opinion should be implemented on remand. It's the majority opinion that controls and it's the majority opinion that the district court was bound to follow on remand and that it did not follow. With respect to the contractual course of dealings, the district court did not meaningfully reconsider that factor at all and the new conclusion that it reached on remand for coming to exactly the same conclusion that it came to before was the conclusion that by paying the contractual overhead and indirect expenses the government was not waiving its sovereign immunity or agreeing to pay CERCLA expenses. But neither of those conclusions follow or even are legally correct. CERCLA gives the government sovereign immunity, not contractual provisions and that's not why the contractual provisions are important. That's exactly what the court held in Cadillac, that it wasn't the contract that waived sovereign immunity, it's CERCLA that waived sovereign immunity. Also, it doesn't matter whether the government was agreeing to pay for CERCLA expenses that might have occurred in the future, the reason that those payments are important is because they show that at the time the parties thought that's what was fair and that's what an equitable analysis is supposed to be about, is determining what's fair in terms of an allocation. And the district court simply didn't have discretion to disregard that on remand after this court held in TDY 1 that this was an important factor in the allocation analysis. The government is asking this court to exercise a form of review in which any allocation the court might have possibly reached below between 0 and 100 percent, or 0.6 and 100 percent, which isn't that different, can be affirmed just on the basis of the district court's discretion. But that deprives this court of any meaningful ability to exercise judicial review. That's not what the statute provides for and it would really remove any capacity for this court to guide the analysis in these important cases. Some instructions for the district court on remand after reversal are required. They should make clear that any allocation has to be consistent with the precedents and with the contractual history of the parties. Thank you. Thank you, counsel. The case just argued is submitted and we appreciate very helpful arguments from both of you. And we now stand adjourned for this afternoon's session. This court for this session stands adjourned.
judges: Graber, W. Fletcher, Freudenthal